ATTORNEY GENERAL v. MICHIGAN STATE
TELEPHONE CO.

TELEGRAPHS AND TELEPHONES—RATES—FEDERAL CONTROL.
   Where the President of the United States, acting under
   the authority given him by joint resolution of Congress
   (40 U. S. Stat. 904, chap. 154), took possession and con-
   trol of the telegraph and telephone systems of the United
   States as a war measure, and such control and operation
   were exercised through the postmaster general, the latter
   had the power to prescribe local rates for telephones in
   the city of Detroit without reference to the laws of the
   State of Michigan relating thereto; the questions involved
   being Federal and controlled by the decisions of the
   Supreme Court of the United States.

   Appeal from Ingham; Wiest, J. Submitted April
16, 1919. (Docket No. 50.) Decided June 13, 1919.

   Bill by Alex. J. Groesbeck, attorney general, against
the Michigan State Telephone Company and another to
restrain a proposed increase in rates. From a decree
for plaintiff, defendants appeal. Reversed, and bill
dismissed.

   *Alex. J. Groesbeck,* Attorney General, *Leland W.
Carr* and *Thomas G. Baillie,* Assistants Attorney Gen-
eral (*David H. Crowley,* of counsel), for plaintiff.

   *Stevenson, Carpenter, Butzel & Backus, Charles M.
Bracelen* and *Thomas G. Long* (*Leo M. Butzel* and
*Eugene S. Wilson,* of counsel), for defendants.

   MOORE, J. This is an action brought by the attor-
ney general for the purpose of securing an injunction
to restrain a proposed increase in telephone rates, the
bill of complaint being founded upon the proposition
that such increase has not been obtained by the meth-

od prescribed by the laws of the State in that an application had not been filed with, or approval obtained from, the Michigan railroad commission as prescribed by section 10 of Act No. 206 of the Public Acts for the year 1913 (2 Comp. Laws 1915, § 6698).

The answer set forth the various steps by which the telephone lines of the United States, including those of the defendant telephone company, came into the control of the postmaster general, and asserted that the increase in rates was due to an order made by the postmaster general. The answer denied the authority of the court to grant the relief prayed for in the bill of complaint for the reason that the postmaster general had not been made a party defendant to the said bill and that the action was in effect a suit against the United States government and without its consent.

Upon the issues thus made the matter came on for hearing and the court issued its injunction restraining the defendants from putting into effect the proposed schedule of rates. This is an appeal from that decree.

We quote from the brief of the attorney general:

"Two questions only are presented for consideration:

"*First:* Has the postmaster general, by virtue of the joint resolution of congress, the authority and power to prescribe local rates applicable only to the city of Detroit without reference to the laws of the State of Michigan relating thereto?

"*Second:* Has the circuit court for the county of Ingham, in chancery, jurisdiction to entertain proceedings and grant injunctive relief?"

Litigation of like character to that involved here has arisen in a number of States. In Oklahoma and Massachusetts injunctive relief was refused. In Mississippi and North Dakota and perhaps other States it was granted. Because of the great importance of

the questions involved the Supreme Court of the United States granted an early hearing and rendered a decision therein very promptly. On the second day of this month the court handed down a decision in the case of *Dakota Central Telephone Co.* v. *State of South Dakota*, 39 Sup. Ct. Rep. 507, in which the 'first question presented by the brief of the attorney general in the instant case is answered in the affirmative. We quote from the opinion handed down in that case:

"On the 16th of July, 1918, congress adopted a joint resolution (40 U. S. Stat. 904, chap. 154), providing:

" 'That the President during the continuance of the present war is authorized and empowered, whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any telegraph, telephone, marine cable, or radio system or systems, or any part thereof, and to operate the same in such manner as may be needful or desirable for the duration of the war, which supervision, possession, control or operation shall not extend beyond the date of the proclamation by the President of the exchange of ratifications of the treaty of peace: *Provided*, That just compensation shall be made for such supervision, possession, control, or operation, to be determined by the President; * * * *Provided, further,* That nothing in this act shall be construed to amend, repeal, impair or affect existing laws or powers of the States in relation to taxation or the lawful police regulations of the several States, except wherein such laws, powers, or regulations may affect the transmission of government communications, or the issue of stocks and bonds by such system or systems.'

"Six days thereafter, on the 22d of July, the President exerted the power thus given. Its exercise was manifested by a proclamation which, after reciting the resolution of congress, declared:

" 'It is deemed necessary for the national security and defense to supervise and take possession and assume control of all telegraph and telephone systems and to operate the same in such manner as may be needful or desirable:

" 'Now, therefore, I, Woodrow Wilson, President of the United States, under and by virtue of the powers vested in me by the

foregoing resolution, and by virtue of all other powers thereto me enabling, do hereby take possession and assume control and supervision of each and every telegraph and telephone system and every part thereof, within the jurisdiction of the United States including all equipment thereof and appurtenances thereto whatsoever and all materials and supplies. It is hereby directed that the supervision, possession, control and operation of such telegraph and telephone systems hereby by me undertaken shall be exercised by and through the postmaster general.' [40 U. S. Stat. 163.]

"The proclamation gave to the postmaster general plenary power to exert his authority to the extent he might deem desirable through the existing owners, managers, directors or officers of the telegraph or telephone lines, and it was provided that their services might continue as permitted by general or special orders of the postmaster general.

"It was declared that—

" 'from and after twelve o'clock midnight on the 31st day of July, 1918, all telegraph and telephone systems included in this order and proclamation shall conclusively be deemed within the possession and control and under the supervision of said postmaster general without further act or notice.'

"Under this authority the postmaster general assumed possession and control of the telephone lines and operated the same. On the 31st day of October, 1918, the President through the postmaster general in the exercise of the duty imposed upon him by the resolution of congress to make compensation, concluded a contract with the telephone companies of the most comprehensive character covering the whole field while the possession, control and operation by the United States continued. By its terms stipulated amounts were to be paid as consideration for the possession, control, and operation by the United States and the earnings resulting 'from such operations became the property of the United States. Although concluded in October, 1918, by stipulation the contract related back to the time when the President took over the property.

"Following this, by authority of the President the postmaster general fixed a general schedule of rates and it was the order to put this schedule in effect which

gave rise to the suit, the trial, and the resulting judgment which we have now under consideration.

"That under its war power congress possessed the right to confer upon the President the authority which it gave him we think needs nothing here but statement, as we have disposed of that subject in the *North Dakota Railroad Case,* 39 Sup. Ct. Rep. 502. And the completeness of the war power under which the authority was exerted and by which completeness its exercise is to be tested suffices, we think, to dispose of the many other contentions urged as to the want of power in congress to confer upon the President the authority which it gave him.

"The proposition that the President in exercising the power exceeded the authority given him is based upon two considerations: *First,* because there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority; indeed, the contention goes further and assails the motives which it is asserted induced the exercise of the power. But as the contention at best concerns not a want of power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power. This must be since, as this court has often pointed out, the judicial may not invade the legislative or executive departments so as to correct alleged mistakes or wrongs arising from asserted abuse of discretion.

"The second contention, although it apparently rests upon the assertion that there was an absence of power in the President to exert the authority to the extent to which he did exert it, when it is correctly understood amounts only to an asserted limitation on the power granted based upon the plain misconception of the terms of the resolution of congress by which the power was given. In other words it assumed that by the resolution only a limited power as to the telephone lines was conferred upon the President, and hence that the assumption by him of complete possession and control was beyond the authority possessed. But although it may be conceded that there is some ground for contending, in view of the elements of authority enumerated in the resolution of congress, that there was power given to take less than the whole if the

President deemed it best to do so, we are of opinion that authority was conferred as to all the enumerated elements and that there was hence a right in the President to take complete possession and control to enable the full operation of the lines embraced in the authority. The contemporaneous official steps taken to give effect to the resolution, the proclamation of the President, the action of the postmaster general under the authority of the President, the contracts made with the telephone companies in pursuance of authority to fix their compensation, all establish the accuracy of this view, since they all make it clear that it was assumed that power to take full control was conferred and that it was exerted so as to embrace the entire business and the right to the entire revenues to arise from the act of the United States in carrying it out. Indeed congress in subsequently dealing with the situation this produced would seem to have entertained the same conception as to the scope of the power conveyed by the resolution and dealt with it from that point of view. (Act of October 30, 1918, 40 U. S. Stat. 1017, chap. 197.)"

The opinion concluded by reversing the decree granting an injunction. It follows that the second question stated in the brief of the attorney general must be answered in the negative.

The questions involved are Federal questions and this court deems it to be its duty to accept the decrees of the Supreme Court of the United States in relation to Federal questions as final.

It follows that the decree of the court below must be reversed and the bill of complaint dismissed, but without costs to either party.

BIRD, C. J., and STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred. OSTRANDER, J., did not sit.